# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**RUAL TRADE LTD.,**
          **Plaintiff,**

    **v.**                                 **Case No. 07-C-1015**

**VIVA TRADE LLC, VLADIMIR ROMANOV,**
**ROMAN ROMANOV and**
**UKIO BANKAS INVESTICINE GROUP,**
                 **Defendants.**

---

### <u>DECISION AND ORDER</u>

Plaintiff Rual Trade Ltd. ("Rual") brought this action in state court asserting breach of contract and related claims against defendants Viva Trade LLC ("Viva"), Vladimir Romanov ("Vladimir"), Roman Romanov ("Roman") and Ukio Bankas Investicine Group ("UBIG"). I will refer to the Romanovs and UBIG together as the "Lithuanian defendants." Defendants removed the case pursuant to 9 U.S.C. § 205, which authorizes the removal of cases relating to arbitration proceedings under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention"), an international treaty to which the United States is a party. Rual now moves for a default judgment against Viva, and Viva and the Lithuanian defendants bring separate motions to dismiss Rual's complaint.

## I. BACKGROUND

Rual, a British Virgin Islands corporation, is a subsidiary of Russian Aluminum, a Russian entity which is the world's largest aluminum manufacturer. UBIG is a Lithuanian investment company and the majority shareholder of the Birac Alumina Refinery, a producer of alumina (the principal ore in aluminum) located in Bosnia-Herzegovina.

Vladimir is the chairman of UBIG's board, and Roman is Vladimir's son and a UBIG board member.  Viva is something of a mystery.  It was organized in 2003 as a Wisconsin limited liability company.  Rual alleges that it has one named member, an Irish entity which has dissolved, and no named managers.  Its 2005 annual report lists a British Virgin Islands address.  According to evidence presented by Rual, Viva was established by a Delaware company that sets up business entities at the behest of a Latvian company that sets up business entities.  The Latvian company then sold it to Rita Matuziene, a Lithuanian attorney and a UBIG board member, who bought it on behalf of an unnamed client.  Rual asserts that the Lithuanian defendants are Viva's true owners and that they use it as a shell corporation to escape liability.  The Lithuanian defendants state that Viva is an alumina distributor owned by Eduard Mitelman, a citizen of Lithuania and Belarus.  Viva has submitted no information about its business.

Rual's suit arises out of commercial transactions that occurred in Eastern Europe in 2003 and 2004.  In 2003, Rual negotiated an agreement to purchase alumina from the Birac refinery.  Rual alleges that it primarily negotiated with Vladimir and that it believed that it was dealing with UBIG, but at the last minute, Vladimir named Viva as the seller. Roman signed the contract (the "supply contract") on behalf of Viva.  In January 2004, just before Rual was scheduled to receive its first shipment of alumina, Vladimir demanded that Rual pay more and the parties amended the supply contract to include a higher price. Soon after, Rual received a portion of its first shipment, but Vladimir stated that he could not deliver more alumina because the Birac refinery needed repairs.  As a result, Rual entered into a Memorandum of Understanding with UBIG requiring Rual to invest $3.5 million in UBIG and loan UBIG another $3.5 million for the purpose of making repairs to the

2

refinery. Vladimir signed the memorandum on behalf of UBIG. Subsequently, allegedly at Vladimir's request, Rual entered into a superceding Memorandum of Understanding ("the MOU"), with Viva replaced as the seller. Roman signed on behalf of Viva. According to Rual, in April 2004, it gave Viva the $3.5 million investment. In May 2004, Rual and Viva entered into a "Loan Agreement" governing the $3.5 million loan and subsequently Rual advanced Viva the money. However, Rual asserts that Viva did not use the investment or loan payments to repair the Birac refinery and did not deliver the alumina required by the supply contract or repay the loan.[1]

In December 2004, Rual commenced arbitration proceedings in Stockholm and was awarded $5,663,510 against Viva for Viva's breach of the supply contract. Rual attempted to bring the Romanovs into the arbitration, but the arbitrator found that, unlike Viva, they were not parties to the contract and therefore had not agreed to arbitrate any disputes. Rual also attempted to bring a claim that the defendants had misused its $3.5 million investment and $3.5 million loan, and had failed to repay the loan, but the arbitrator found that the parties to the MOU had not agreed to arbitrate disputes arising out of the MOU in Stockholm.[2] In 2006, Rual converted the $5,663,510 arbitration award against Viva to a judgment in the United States but has been unable to collect.

In the present action, Rual contends that the Lithuanian defendants used Viva as their alter ego and, as a result, are liable for the obligations that it incurred. Rual brings claims against all defendants for breach of contract, theft by fraud and unjust enrichment

---

[1]The loan was to have been repaid in alumina.

[2]As I will discuss, the parties agreed to arbitrate at least some disputes related to the MOU in Switzerland.

3

and, in addition, claims against the Lithuanian defendants for intentional misrepresentation and personal liability as Viva's agents.

## II.  SUBJECT MATTER JURISDICTION[3]

In order for a federal court to have jurisdiction over a case, Article III of the Constitution must confer power to hear the case, and Congress must enact a statute authorizing the court to exercise such power.  Article III § 2 provides that federal courts may decide cases arising under "Treaties."  In the present case, some of Rual's claims and Viva's defenses are related to an arbitration proceeding under the Convention.  As indicated, the Convention is a treaty.  Thus, the case is within Article III's grant of jurisdiction.  See Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 491-92 (1983) (stating that the Constitution's "arising under" language is broad enough to encompass cases in which the plaintiff's claims are not based on federal law but are intimately connected to federal law); Int'l Armor & Limousine Co. v. Moloney Coachbuilders, Inc., 272 F.3d 912, 915 (7th Cir. 2001) (same).  Further, 9 U.S.C. § 203 provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States."  This provides a statutory basis for jurisdiction.  Certain Underwriters at Lloyd's London v. Argonaut Ins. Co., 500 F.3d 571, 581 n.9 (7th Cir. 2007). Thus, I have subject matter jurisdiction over the case.

## III.  RUAL'S MOTION FOR DEFAULT JUDGMENT

Rual brought this action in state court, and Viva failed to timely respond.  Rual moved for a default judgment, after which Viva appeared and asked for more time to

---

[3]Neither party has raised the issue of subject matter jurisdiction.  However, because the basis for jurisdiction is not obvious, I must address the issue sua sponte.

4

respond.  The state court gave Viva more time but also left open the possibility that it would grant Rual's motion.  Subsequently, defendants removed after which Rual filed a motion for default judgment in this court.  I will treat the parties' state court motions as effectively terminated and address the motion that Rual filed in this court.  I apply federal law to such motion.  Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, 415 U.S. 423, 436-37 (1974); Fed. R. Civ. P. 81(c)(1).

Under Fed. R. Civ. P. 55(b), I have discretion with respect to granting a default judgment.  In exercising discretion, I consider such factors as the possibility of prejudice to the plaintiff, the merits of the claims, the sufficiency of the complaint, the sum of money at stake, the possibility of a factual dispute, whether the default was due to excusable neglect and the strong policy favoring deciding cases on the merits.  55 Moore's Federal Practice - Civil § 55.31[2].  Further, I may analyze the issue as if it involved the question of good cause for setting a default aside.  Id.; see also Sims v. EGA Prods., Inc., 475 F.3d 865, 868 (7th Cir. 2007) (outlining the good cause standard).  Generally speaking, it is desirable to resolve cases on their merits.  Yong-Qian Sun v. Bd. of Trs., 473 F.3d 799, 811 (7th Cir. 2007).

Based on the foregoing principles, I will deny Rual's motion for default judgment.  Viva appeared soon after Rual moved for default judgment, Rual was not prejudiced by the delay, and Rual's claims involve more than $10 million and a number of defendants.  Further, Viva has presented a meritorious defense, i.e., one "good at law," Bieganek v. Taylor, 801 F.2d 879, 882 (7th Cir. 1986).  Namely, Viva asserts that all of plaintiff's claims

5

against it must be arbitrated under the Convention.[4]  The existence of a meritorious defense is relevant both to setting aside a default and granting default judgment.  While Viva has not argued that its neglect of the state court's deadlines was excusable, this factor alone is insufficient to support granting default judgment.[5]  Thus, I will deny Rual's motion.

## IV.  MOTIONS TO DISMISS

Both the Lithuanian defendants and Viva ask me to dismiss the action based on forum non conveniens.  The Lithuanian defendants also contend that I lack personal jurisdiction over them and that Rual's complaint fails to state a claim against them.  Viva also contends that Rual's claims against it must be arbitrated.

### A.    Forum Non Conveniens

I may address a motion to dismiss based on forum non conveniens before addressing personal jurisdiction.  Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 127 S. Ct. 1184, 1188 (2007).  A federal district court has discretion to dismiss a case on the ground of forum non conveniens when an alternative adequate forum has jurisdiction to hear the case and litigating the case in that forum "best serves the convenience of the parties and the ends of justice."  Kamel v. Hill-Rom Co., Inc., 108 F.3d 799, 802 (7th Cir. 1997).  In federal courts, forum non conveniens applies only in cases where the alternative forum is abroad.  Sinochem Int'l Co., 127 S. Ct. at 1190.

_____

[4]Viva also argues that I should dismiss this suit based on forum non conveniens. However, forum non conveniens is not a "meritorious defense" for the purpose of contesting a default judgment.  The doctrine relates to the convenience of the defendant, and it would be inappropriate to excuse a defendant for failing to timely answer because the forum may be inconvenient.

[5]The record suggests possible excuses.  Viva's counsel told the state court that the case was legally complex and complicated by language barriers and time zone differences.

6

In applying the doctrine, a court must first determine whether the alternative forum is adequate.  This requirement is ordinarily satisfied when the defendants are "amenable to process in the other jurisdiction."  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22 (1981).  However, in "rare circumstances," the other forum may be inadequate because it offers a "clearly unsatisfactory" remedy.  Id.  If the court determines that the alternative forum is adequate, it turns to whether the other forum is more convenient for the parties and looks to a variety of private and public factors.  Id. at 241 n.6; see also Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947).   "A defendant invoking forum non conveniens ordinarily bears a heavy burden in opposing the plaintiff's chosen forum."  Sinochem Int'l Co., 127 S. Ct. at 1191.  However, this presumption "'applies with less force'" when the plaintiff's choice is not its home forum.  Id. (quoting Piper Aircraft Co., 454 U.S. at 255-56). This is because in such a case, "the risk that the chosen forum really has little connection to the litigation is greater."  Gullone v. Bayer Corp. (In re Factor VIII or IX Concentrate Blood Products), 484 F.3d 951, 956 (7th Cir. 2007).

Defendants suggest Lithuania as an alternative forum for Rual's claims, but the parties disagree as to its adequacy.  Lithuanian courts have jurisdiction over the Lithuanian defendants but appear to lack personal jurisdiction over Viva.  In a brief, Viva represents that it if I dismiss this action based on forum non conveniens, it "would consent to the jurisdiction of the Lithuanian court for purposes of resolving the issues raised in the complaint, including whether the claims against Viva should be submitted to arbitration under the Swiss Rules of International Arbitration."  (Viva's Br. in Supp. of Mot. to Dismiss at 3.)  However, "arguments in a . . . brief, unsupported by documentary evidence, are not evidence."  United States v. Stevens, 500 F.3d 625, 628 (7th Cir. 2007); accord Campania

7

Mgmt. Co. v. Rooks, Pitts & Poust, 290 F.3d 843, 853 (7th Cir. 2002) (stating that "it is universally known that statements of attorneys are not evidence"). Viva presents no affidavit or other statement from an individual who has authority to make decisions for Viva and who can be held accountable. Thus, I cannot presently find that Viva will consent to jurisdiction in Lithuania and is thereby "amenable to process" there. See Piper Aircraft Co., 454 U.S. at 254 n.22. As such, it is not clear that Lithuania is an adequate alternative forum and, regardless of the private and public factors at stake, I may not dismiss this action on the basis of forum non conveniens at this time. However, defendants may refile their motions to dismiss based on forum non conveniens if they produce evidence that Viva is amenable to suit in Lithuania.

**B.      Personal Jurisdiction Over Lithuanian Defendants**

Fed. R. Civ. P. 12(b)(2) governs a motion to dismiss for lack of personal jurisdiction. The burden of proving jurisdiction rests with the plaintiff. Shepherd Inv. Int'l, Ltd. v. Verizon Commc'ns Inc., 373 F. Supp. 2d 853, 859 (E.D. Wis. 2005). At this point in the case, the burden is not a heavy one. Id. If a defendant seeks dismissal based on lack of personal jurisdiction but does not present any evidence, the court simply asks whether the complaint alleges facts that arguably provide a basis for jurisdiction. Rice v. Nova Biomed. Corp., 38 F.3d 909, 914 (7th Cir. 1994). If the defendant presents evidence, then the plaintiff must present its own evidence. Purdue Research Found. v. Sanofi-Synthelabo, 338 F.3d 773, 783 (7th Cir. 2003). If a court considers evidence, it must take it in the plaintiff's favor and ask whether the plaintiff has established a prima facie case of personal jurisdiction. Id. at

8

782-83; Hyatt Int'l Corp. v. Gerardo Coco, 302 F.3d 707, 713 (2002).[6] If the plaintiff raises a plausible basis for jurisdiction but has problems of proof because the defendant controls relevant evidence, the court may permit limited discovery.  See Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reins. Co., 440 F.3d 870, 878 (7th Cir. 2006); Robert C. Casad & William B. Richman, 2 Jurisdiction in Civil Cases § 6-1[d] (3d ed. 1993).

In the present case, both parties submit evidence regarding jurisdiction, and plaintiff requests jurisdictional discovery.  Accepting Rual's version of the facts as true, I must first determine whether a statute provides jurisdiction, and if so, I ask whether the Constitution permits the exercise of such jurisdiction.  See Shepherd Inv., 373 F. Supp. 2d at 859.

As to the statutory basis for jurisdiction, Rual relies on Wisconsin's long-arm statute in combination with its alter ego theory.  Specifically, Rual asserts that I have jurisdiction over the Lithuanian defendants under Wis. Stat. § 801.05(1)(c), which provides general jurisdiction over any "domestic . . . limited liability company."  Rual argues that this provision confers jurisdiction over the Lithuanian defendants because Viva, a Wisconsin LLC, is their alter ego and therefore they are indistinguishable from Viva for jurisdictional purposes.  Wisconsin law governs Rual's alter ego theory.  Taurus IP, LLC v. DaimlerChrysler Corp., 519 F. Supp. 2d 905, 919 (W.D. Wis. 2007).[7]  Under such law, a

_____

[6]The prima facie standard only applies to a motion to dismiss filed at the outset of litigation.  The Seventh Circuit has clarified that after a court denies such a motion, the defendant may still press the issue where there is a factual dispute regarding the basis for jurisdiction.  Rice, 38 F.3d at 914-15; see also 2-12 Moore's Federal Practice - Civil § 12.31[5].  The defendant may insist on a hearing at which the plaintiff must prove the existence of personal jurisdiction by a preponderance of the evidence, either early in the case or after some discovery. Rice, 38 F.3d at 914-15; see also Purdue Research Found., 338 F.3d at 782; Hyatt Int'l Corp., 302 F.3d at 713.

[7]I will discuss the choice of law issue in greater detail later in this decision.

9

court may consider a defendant to be the alter ego of a corporation (or LLC) if, with respect to the transaction at issue, the defendant dominated the entity "so completely 'that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own.'" Id. (quoting Consumer's Co-Op of Walworth Co. v. Olsen, 142 Wis. 2d 465, 484 (1988)); see also Depuy Orthopaedics, Inc. v. Gault South Bay, Inc., No. 07-CV-425, 2007 U.S. Dist. LEXIS 84257, at *14-15 (N.D. Ind. Nov. 13, 2007).  It must also be apparent that "'applying the corporate fiction would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim.'" Taurus IP, LLC, 519 F. Supp 2d at 919 (quoting Posyniak v. Sch. Sisters of St. Francis, 180 Wis. 2d 619, 636 (Ct. App. 1993)).  Alternatively, Rual asserts that I have jurisdiction over the Lithuanian defendants under § 801.05(8), which provides for specific jurisdiction over any "director, officer or manager" of a domestic LLC in a case arising out of such role.   See Kubin-Nicholson Corp. v. Gillon, 525 F. Supp. 2d 1071, 1074 (E.D. Wis. 2007).

The Lithuanian defendants submit affidavits from the Romanovs and from Rita Matuziene stating that they have "never had any direct or indirect ownership interest in Viva Trade," "never been a shareholder, director or manager of Viva Trade," "never controlled the activities or finances of Viva Trade" and "never shared offices or employees with Viva Trade."  (Vladimir Romanov Decl. ¶ 15; Roman Romanov Decl. ¶ 15; Matuziene Decl. ¶ 23.)  Matuziene states that Eduard Mitelman "owns" Viva but provides no basis for personal knowledge of such fact and provides no information about Mitelman or his ownership of Viva.  (Matuziene Decl. App. A.)

Rual contends that the Lithuanian defendants' affidavits are false.  It presents evidence that a Latvian company directed a Delaware company to create Viva in

Wisconsin for purposes unknown. The Latvian company then quickly sold Viva to Rita Matuziene, who apparently made the purchase on behalf of a client. Rual further presents evidence that Vladimir and Roman negotiated and executed contracts worth more than $60 million dollars on Viva's behalf in 2003 and 2004, and that UBIG was so intimately involved with these contracts that Rual's representatives believed until the last minute that it was the seller. Rual further shows that, on paper, Viva has no member, manager or business. Rual argues that it is reasonable to infer from these facts that the Lithuanian defendants owned or otherwise completely controlled Viva during the relevant period.

The parties' evidence is contradictory and incomplete, but Rual's evidence raises a significant possibility that one or more of the Lithuanian defendants have treated Viva as an alter ego. Thus, jurisdictional discovery may be appropriate. The Lithuanian defendants' affidavits indicate that they have information about Viva. (See, e.g., Vladimir Romanov Decl. ¶ 3 (stating that "at Viva Trade's request, I assisted in the negotiations and implementation" of the contracts); Roman Romanov Decl. ¶ 3 ("Viva Trade is one of the distributors used to distribute alumina from the Birac Refinery."); Matuziene Decl. ¶ 3 (stating that alumina "is distributed through a number of companies, one of which is Viva Trade"); id. ¶ 4 (stating that "at Viva Trade's request, UBIG" was involved in the deals between plaintiff and Viva Trade); id. App. A (referring to Eduard Mitelman as Viva's "owner").) Further, if Rual can discover who speaks for Viva, it can seek discovery from such persons. If plaintiff discovers evidence that the Lithuanian defendants controlled Viva in 2003 and 2004, then such defendants would fall within Wisconsin's long-arm statute.[8]

---

[8]The Lithuanian defendants argue that they cannot come within an alter ego theory of liability unless they held some sort of official position with Viva in 2003 and 2004, such

Case 2:07-cv-01015-LA   Filed 04/28/08   Page 11 of 24   Document 49

However, before I order discovery, I must find that Rual has made a colorable argument that discovery will establish a constitutional as well as a statutory basis for jurisdiction. A defendant cannot be haled into court consistent with due process unless he has "purposefully established 'minimum contacts' in the forum state." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). The nature and amount of contacts required depends on whether the plaintiff seeks to establish "general" or "specific" jurisdiction. General jurisdiction applies when the defendant has continuous and systematic contacts with the state, irrespective of whether the defendant's connections are related to the particular cause of action. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.9 (1984). Specific jurisdiction applies when the cause of action arises out of or is related to the defendant's contacts with the forum state. Id. at 414 n.8. Such contacts need not be substantial or ongoing, but "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp., 471 U.S. at 475. As to when contacts are "related to" the suit, there is no "set formula," but the court's determination "must rest on a consideration of what is fair and reasonable in the circumstances of each particular case." Deluxe Ice Cream Co. v. R.C.H. Tool Corp., 726 F.2d 1209, 1213 (7th Cir. 1984).

---

as manager or member. However, the alter ego theory of liability is equitable in nature. In re Kaiser, 791 F.2d 73, 75 (7th Cir. 1986) (applying Wisconsin law). If Viva is nothing but a shell entity lacking any officials and the Lithuanian defendants simply affix its name to documents when convenient, I see no reason that the theory could not apply.

12

If the court determines that the defendant has had sufficient contacts with the forum state to support either specific or general jurisdiction, it must then consider "whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" Burger King Corp., 471 U.S. at 476 (quoting Int'l Shoe Co., 326 U.S. at 320). In Asahi Metal Industry Co. v. Superior Court, the Supreme Court identified the factors relevant to this question as the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, the judicial system's interest in efficiency, and the shared interest of the states in furthering substantive social policies. 480 U.S. 102, 113 (1987).

As stated, where a defendant has treated a business entity as an alter ego, the court may treat the defendant and the entity as one and the same for jurisdictional purposes. Taurus IP, 519 F. Supp. 2d at 919; Depuy Orthopaedics, Inc., 2007 U.S. Dist. LEXIS 84257, at *14-15; cf. Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 944 (7th Cir. 2000) (stating that a court should not treat a corporation and its owner the same for jurisdictional purposes when the owner has maintained corporate formalities and has not exercised undue control over the corporation). Courts have general jurisdiction over domestic business entities. See Casad & Richman, supra, at § 2-5[3][a]; see also Pennoyer v. Neff, 95 U.S. 714, 735-36 (1877). Thus, if Rual's discovery shows that the Lithuanian defendants treated Viva, a Wisconsin LLC, as their alter ego, I may exercise jurisdiction over them consistent with due process.

In addition, if Rual discovers that any of the Lithuanian defendants served as Viva's member or manager in 2003 and 2004, this may also indicate that such defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State" and "invok[ed] the benefits and protections" of Wisconsin's laws governing limited liability

13

companies. Burger King Corp., 471 U.S. at 475; accord Stearn v. Malloy, 89 F.R.D. 421, 423-24 (E.D. Wis. 1981). Though corporate ownership alone may not support personal jurisdiction, corporate ownership coupled with wrongful use of the corporation or undue control is sufficient. See Reimer Express World Corp., 230 F.3d at 943. The fact that the Lithuanian defendants may have never set foot in Wisconsin does not change this analysis. See Burger King Corp., 471 U.S. at 476. Further, it would be "fair and reasonable" to conclude that Rual's claims against the Lithuanian defendants, premised on evidence that they used a Wisconsin business entity to perpetrate a fraud, "arise out of" the Lithuanian defendants' contacts with Wisconsin. See Deluxe Ice Cream Co., 726 F.2d at 1213. Thus, Rual may be able to discover evidence supporting specific jurisdiction.

The Lithuanian defendants contend that exercising personal jurisdiction over them would offend substantial justice and fair play primarily because it would be inconvenient for them to travel to Wisconsin. Indeed, the Supreme Court has emphasized the need for careful consideration before exercising jurisdiction over an alien defendant. Asahi Metal Indus. Co., 480 U.S. at 115. However, as stated, I may only exercise jurisdiction over the Lithuanian defendants if the prerequisites discussed above existed, which would likely outweigh concerns about convenience. Further, such evidence would implicate Wisconsin's interest in ensuring that individuals and entities do not reach into the state and take advantage of its legal system for the purpose of defrauding third parties.

For the foregoing reasons, I will permit the parties to engage in jurisdictional discovery. Because "[f]oreign nationals usually should not be subjected to extensive discovery in order to determine whether personal jurisdiction over them exists," Reimer Express World Corp., 230 F.3d at 946, I will closely monitor the discovery process and limit

14

the parties to the least intrusive means available for obtaining needed information. Further, if defendants file additional evidence supporting their forum non conveniens argument, I will consider staying jurisdictional discovery until that issue is resolved.

**C.      Failure to State Claim Against Lithuanian Defendants**

To survive a motion to dismiss for failure to state a claim, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The essence of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is not that the plaintiff has pleaded insufficient facts, it is that even accepting all of the alleged facts, the plaintiff has no legal claim. Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 627 (7th Cir. 1999). Of course, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007) (internal citation omitted). In other words, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Id. at 1974. In addressing personal jurisdiction, I examined evidence outside of the complaint. However, for the purpose of determining whether plaintiff has stated a claim against the Lithuanian defendants, I rely only on the complaint.

**1.      Applicable Law**

I must first determine the law applicable to plaintiff's claims. In examining this issue, the parties agree that I should apply Wisconsin's choice of law rules. As to claims for breach of contract, Wisconsin courts apply the law of the forum with which the contract has the most significant relationship, taking into account the place of contracting, place of

negotiations of the contract, place of performance, location of the subject matter of the contract, and location of the parties. State Farm Mut. Auto. Ins. Co. v. Gillette, 251 Wis. 2d 561, 577 (2002); Haines v. Mid-Century Ins. Co., 47 Wis. 2d 442, 447 (1970). Rual's complaint and the attachments thereto show that the contracts at issue are most significantly related to Lithuania. The parties primarily negotiated and executed the contracts in Lithuania, and most of the parties reside in Lithuania. For these reasons, Rual's fraud, unjust enrichment, and intentional misrepresentation claims also are most significantly related to Lithuania.

However, as to the question of whether Viva was the Lithuanian defendants' alter ego, the choice of law analysis is different. Cf. Int'l Admrs., Inc. v. Life Ins. Co., 753 F.2d 1373, 1376 n.4 (7th Cir. 1985) ("The choice of law is not made once for all issues; the trend is to decide the applicable law for each issue separately.") The general rule is that a plaintiff's alter ego theory is governed by the law of the state in which the business at issue is organized. See Restatement (Second) of Conflict of Laws § 307 (regarding corporations); see also Gann v. William Timblin Transit, Inc., 522 F. Supp. 2d 1021, 1030 (N.D. Ill. 2007).[9] Courts applying Wisconsin choice of law rules in recent years have followed this rule. Prods. v. MNP Corp., 18 F.3d 1384 (7th Cir. 1994) (regarding a corporation); Taurus IP, LLC, 519 F. Supp. 2d at 924-25 (regarding an LLC); Hystro Select Creations v. Paliafito Am., 852 F. Supp. 740, 774 (E.D. Wis. 1994) (regarding a corporation). And the rule makes sense, given that the corporate and LLC forms are

_____

[9]The arbitration panel that examined Rual's claims against Viva regarding the first contract recognized this principle. (Remington Aff. in Supp. of Resp. to Mot. to Dismiss Ex. H at 15.)

16

creations of state statute. See Wis. Stat. § 183.0102, et seq. Thus, the question of whether a third party may ignore the corporate or LLC form in order to reach the individuals or entities behind it sensibly looks to Wisconsin's statutory scheme and case law.

This rule is not immutable. In Beloit Liquidation Trust v. Grade, the state supreme court applied Wisconsin law to a claim that an official of a Delaware corporation breached a fiduciary duty, primarily because the corporation had been headquartered in Wisconsin for 140 years and a state statute specified that state law regarding corporate governance applied "'to all foreign corporations transacting business in this state.'" 270 Wis. 2d 356, 373-74 (2004) (quoting Wis. Stat. § 180.1704). However, Grade does not persuade me to deviate from the normal choice of law rule because, unlike in Grade, Viva does not have a well-established place of business in another jurisdiction; under Rual's version of the facts, it has no real business anywhere.[10] Further, Wis. Stat. § 183.1001 provides that courts should treat LLCs as governed by the law of the state in which they are organized. As such, the factors that persuaded the court to deviate from the normal rule in Grade are not present here and the facts and applicable law support the application of Wisconsin law.

Thus, Rual's substantive claims are governed by Lithuanian law and its alter ego theory by Wisconsin law.[11]

_____

[10]The Lithuanian defendants argue that Wisconsin law should not apply because Viva's contacts with Wisconsin are "so obviously limited and minimal that application of that state's law constitutes officious intermeddling." Grade, 270 Wis. 2d at 374 (internal quotation marks omitted). Under Rual's version of the facts, Viva's contacts with every jurisdiction is limited. This does not mean that no law can restrain its actions.

[11]I have not addressed Rual's "agency" claim for relief, but, as I discuss below, Rual has made no argument concerning this claim.

17

### 2.     Breach of Contract Claim

Rual alleges that defendants breached the MOU by failing to use the $3.5 million investment and $3.5 million loan as promised – namely to repair the Birac refinery – and also by failing to repay the $3.5 million loan.  The Lithuanian defendants respond that they are not parties to the MOU.  However, Rual's complaint alleges sufficient facts to raise an inference that Viva was the Lithuanian defendants' alter ego.  Thus, Rual may be able to pierce Viva's LLC veil by establishing that it perpetrated a fraud and that its finances, policy and business practice were so dominated at the time of the relevant transaction that it "'had at the time no separate mind, will or existence of its own.'"  Taurus IP, LLC, 519 F. Supp. 2d at 919 (quoting Consumer's Co-Op of Walworth County v. Olsen, 142 Wis. 2d 465, 484 (1988)); see also Wis. Stat. § 183.0304(2) (adopting the veil-piercing theory developed in the corporate context for LLCs).  As such, it may proceed on its breach of contract claim against the Lithuanian defendants.[12]

### 3.     Theft by Fraud Claim

Rual alleges that the Lithuanian defendants committed theft by fraud in violation of Wis. Stat. § 895.80 by taking $7 million dollars from Rual pursuant to the MOU and failing to use it for its intended purpose.  However, as discussed, Wisconsin law does not govern plaintiff's substantive claims.  As plaintiff concedes, Lithuania does not recognize any cause of action similar to that in § 895.80.  Thus, I will dismiss this claim.

---

[12]The Lithuanian defendants complain that Rual "fail[ed] to plead an alter ego theory of liability anywhere in their substantive counts."  (Reply Br. filed by the Romanovs and UBIG at 12.)  But Rual's alter ego argument is not itself a substantive claim.  See Peacock v. Thomas, 516 U.S. 349, 354 (1996). Rather, Rual relies on it to overcome what would otherwise be a deficiency in its substantive claims.

18

### 4. Intentional Misrepresentation Claim

Rual alleges that the Lithuanian defendants falsely represented to it that Viva was a "solvent entity within the Romanov group of companies" prior to executing the supply contract and that they needed money with which to improve the Birac refinery. Rual also alleges that the Lithuanian defendants "failed to disclose material facts regarding Viva's complete lack of assets." (Compl. ¶¶ 48, 55, 57.) Rual alleges that these misrepresentations damaged it in the amounts of $5,663,510 (the arbitration award) and $7 million (the MOU amount). The Lithuanian defendants do not respond to Rual's allegation regarding the refinery. As to the allegations relating to Viva, the Lithuanian defendants contend that they fail because Rual alleges only that Viva is presently insolvent not that it was insolvent when the statements were made. They also argue that the alleged misrepresentations regarding the MOU have not yet damaged Rual because Rual has not yet obtained a judgement against Viva on the MOU on which it has been unable to collect. However, Rual alleges that the Lithuanian defendants used Viva as a shell entity, and such allegations are sufficient to permit an inference that the Lithuanian defendants knew that their alleged statements were untrue when made. Further, Rual pleads facts sufficient to show that the Lithuanian defendants' alleged statements damaged Rual by causing it to turn over money to them.

### 5. Agency Claim

Rual makes a claim for "Personal Liability of the Romanovs and UBIG as Viva's Agents." This does not state a substantive claim and is not a restatement of Rual's alter ego theory. Moreover, Rual does not explain how an agency relationship imposes liability

19

on the agent and, in responding to the Lithuanian defendants' motion to dismiss, appears to have abandoned this claim. To the extent that Rual's reference to agency is an attempt to raise an independent cause of action, I will dismiss it.

### 6. Unjust Enrichment Claim

Finally, Rual claims that defendants have been unjustly enriched to the tune of more than $12 million. The Lithuanian defendants present evidence that Lithuanian law does not permit a plaintiff to recover for both breach of contract and unjust enrichment. Rual counters that its unjust enrichment claim is an alternative to other substantive claims such as its breach of contract claim, and that it will not recover under both theories. Defendants do not reply to this assertion, and I have no reason to think that Rual's use of alternative causes of action is inconsistent with Lithuanian law. Thus, at present, I will permit Rual to proceed with this claim.

### D. Arbitration Clause as to Viva

The Convention requires the courts of contracting states to give effect to arbitration provisions included in international commercial agreements. 9 U.S.C. § 201, et seq.; Certain Underwriters at Lloyd's London, 500 F.3d at 573, 577. Federal courts examining whether to order arbitration pursuant to the Convention generally ask four questions:

(1) Is there an agreement in writing to arbitrate the subject of the dispute?

(2) Does the agreement provide for arbitration in the territory of the signatory of the Convention?

(3) Does the agreement arise out of a legal relationship whether contractual or not, which is considered as commercial?

(4) Is a party to the agreement not an American citizen, or does the commercial relationship have some reasonable relation with one or more foreign states?

Riley v. Kingley Underwriting Agencies, Ltd., 969 F.2d 953, 959 (10th Cir. 1992); Ledee v. Ceramiche Ragno, 684 F.2d 184, 186-87 (1st Cir. 1982).  If the court answers each of these questions in the affirmative, it must order the parties to arbitrate their dispute unless it finds the agreement to be "null and void, inoperative, or incapable of being performed." Riley, 969 F.2d at 959; Ledee, 684 F.2d at 186-87.

Viva asserts that Rual must arbitrate all of it claims against Viva not already arbitrated and reduced to judgment.  Viva bases this argument on the "Loan Agreement" between it and Rual, which states:

> Any dispute, controversy or claim arising out of or in relation to this contract, including the validity, invalidity, breach or termination thereof, shall be resolved by arbitration in accordance with the Swiss Rules of International Arbitration of the Swiss Chambers of Commerce in force on the date when the Notice of Arbitration is submitted in accordance with these rules.

(Viva's Br. in Supp. of Mot. to Dismiss Ex. B.)  The parties agree that this is an agreement to arbitrate disputes, Switzerland is a signatory to the Convention, the relationship between the parties is commercial and at least one party to the agreement is not a United States citizen, and Rual does not argue that the agreement is "null and void, inoperative, or incapable of being performed,"  Riley, 969 F.2d at 959; Ledee, 684 F.2d at 186-87.

However, Rual argues that I should not order arbitration because it will drag out the dispute contrary to the Convention's goal and that arbitrating in Switzerland will be futile because in that forum it cannot present claims against the Romanovs or UBIG.  Even assuming that Rual's assertions are correct, I cannot disregard an international treaty, and Rual cites no cases suggesting otherwise.  Further, Rual's decision to raise its arbitrable

Case 2:07-cv-01015-LA   Filed 04/28/08   Page 21 of 24   Document 49

claims in the Wisconsin courts before arbitrating them pursuant to the agreement is the cause of any lengthening of the controversy. As such, I must dismiss "any dispute, controversy or claim arising out of or in relation to" the loan agreement. (Viva's Br. in Supp. of Mot. to Dismiss Ex. B.) It is clear that Rual's claims regarding the $3.5 million loan fall within this arbitration agreement and must be dismissed from this action. However, the parties dispute whether the first $3.5 million that plaintiff gave to Viva pursuant to the MOU falls within the loan agreement.

The loan agreement's arbitration clause is very broad. Moreover, the Convention and federal law recognize a strong policy favoring arbitration. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985). At the same time, "[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960). I cannot find that the loan agreement requires Rual and Viva to arbitrate disputes arising out of the first $3.5 million payment. The loan agreement does not mention such payment.[13] This is not surprising given that (as Rual asserts and Viva does not dispute) Rual had already made the first $3.5 million payment when the parties signed the loan agreement. Given that Viva had no obligation to pay back the first $3.5 million, that transaction was essentially over. While the loan agreement's arbitration language is very broad, its "scope is not without limit." (Remington Aff. in Supp. of

---

[13]The loan agreement references the MOU's language regarding the loan but does not incorporate the entire MOU.

22

Response to Mot. to Dismiss Ex. H at 32.)[14]  Given that the MOU is silent on the issue of arbitration, the loan agreement is silent on the issue of the first $3.5 million payment and the loan agreement was executed after the first payment, I must find that the loan agreement does not govern disputes regarding the first payment.

Thus, I will dismiss all of Rual's claims against Viva regarding its loan of $3.5 million to Viva so that plaintiff can arbitrate them in Switzerland but will not dismiss its claims regarding the earlier payment of $3.5 million.

## V.  CONCLUSION

As discussed, I will deny plaintiff's motion for default judgment.  As to the motions to dismiss, I will dismiss plaintiff's claims against Viva regarding the $3.5 million loan in favor of arbitration and dismiss plaintiff's claim against the Lithuanian defendants filed under Wis. Stat. § 895.80 and its agency claim against such defendants.  I will not dismiss this action on the basis of forum non conveniens at this time, but the defendants may refile a motion on this basis so long as they accompany such motion with relevant evidence. Finally, the Lithuanian defendants' motion to dismiss remains pending because I have not yet resolved the question of personal jurisdiction over such defendants.  I will set a prompt status conference to discuss future proceedings.

**For the reasons stated,**

**IT IS ORDERED** that plaintiff's motion for default judgment is **DENIED**.

_____

[14]I quote here from the Stockholm arbitration panel's description of Viva Trade's argument that the first $3.5 million was <u>not</u> governed by the arbitration clause in the <u>first</u> contract.  Viva Trade argued there that the fact that the MOU was "silent on the issue of arbitration" indicated that the parties did not intend to incorporate an earlier agreement to arbitrate disputes regarding a separate transaction.  (<u>Id.</u>)

Case 2:07-cv-01015-LA   Filed 04/28/08   Page 23 of 24   Document 49

**IT IS FURTHER ORDERED** that defendant Viva Trade LLC's motion to dismiss is **GRANTED IN PART AND DENIED IN PART** as described herein.

**IT IS FURTHER ORDERED** that a telephonic status conference will be held on **Friday, May 2, 2008 at 3:30 p.m.** The court will initiate the call. The participation of the attorney handling the case is required.

Dated at Milwaukee, Wisconsin this 28 day of April, 2008.


/s_____
LYNN ADELMAN
District Judge